## Woolston's Appeal.

1. Real estate paid for by a husband's money was conveyed to his wife subject to a mortgage given by a former owner. The land was sold on an execution against the husband, and the purchaser recovered possession in ejectment against the wife. The land was afterwards sold under the mortgage and bought by the same purchaser. In distributing the proceeds of sale, it was *held*, that the wife might claim the balance after payment of the mortgage, notwithstanding the recovery against her in the ejectment. *Per* Ross, Auditor.

2. When it is established that at the time of a voluntary settlement by the husband on his wife, he was indebted to any amount, the burden is upon those claiming under the settlement to show solvency sufficient to establish that it was not covinous. *Id.*

3. Such settlement, although not fraudulent *per se*, yet if made with a fraudulent intent as to any creditor then existing or who might in future exist, would be void. *Id.*

APPEAL from the Court of Common Pleas of *Bucks county*, by Thomas L. Woolston, in the matter of the distribution of the proceeds of sale of real estate, under *levari facias*, Early *v.* Winder.

The premises sold under the above writ were owned in 1845 by Winder, who in that year executed a mortgage of them to Jane Hillborn to secure the sum of $2400. In April 1857 Winder conveyed the premises to John Ely, subject to the mortgage; he shortly afterwards sold them to John Longstreth, and by direction of Longstreth conveyed them, on the 19th of September 1857, to Mrs. Rebecca Plumley, subject to the mortgage, for the consideration of $3000, which was paid by the husband of Mrs. Plumley with his own funds.

On the 17th of July 1861, Woolston recovered a judgment against Mr. Plumley for $2160, on a cause of action which accrued October 15th 1860. On this judgment the premises were sold by the sheriff to Woolston for $5. He then instituted an action of ejectment against Mrs. Plumley, obtained judgment September 20th 1864, and possession under a *habere facias*. Subsequently Early, the assignee of the mortgage, subject to which the property was conveyed to Mrs. Plumley, sued it out, and the premises were sold by the sheriff to Woolston for $3000. The deed was acknowledged September 19th 1865. Woolston had continued in possession till this sale. The contest for the balance of the funds after paying the mortgage, was between Woolston, claiming by virtue of his purchase of the premises under his execution against Mr. Plumley, and his recovery of them in ejectment against Mrs. Plumley, and Mrs. Plumley claiming by virtue of the conveyance to her by Ely in 1857.

The matter was referred by the Court of Common Pleas to Henry P. Ross, Esq., whose report was approved both by the court below and the Supreme Court.

[Woolston's Appeal.]

After stating the introductory facts as given above, the auditor reports:—

"At the very outset of the hearing before the auditor the counsel for Woolston desired that he should be entered on the record as objecting to any claim made by Mrs. P. upon the fund in court, on the ground that she had no legal interest which she could here maintain. The counsel for Mrs. P. desired that the same objection on his part against the claim of Mr. W., and for the same reason, should also be entered upon the record.

"In support of his objection, the counsel of Mr. W. earnestly contended that Mrs. P. could not sustain her claim to this fund, even admitting that the voluntary settlement was made in good faith, and under circumstances by which it might be sustained, because, at the last sheriff's sale, she had instituted no second action of ejectment against W.; and the premises being in his possession at that time by virtue of the verdict and judgment in the former suit, she was now estopped from appearing as a claimant to the fund, raised by a sale on an encumbrance upon a prior title. The argument of the counsel upon this point, though ingenious, is entirely fallacious. It will be admitted by all that the right to receive the residuary proceeds of a judicial sale of land is vested in the person in whom the complete legal and equitable title is vested. But to complete and perfect a title *possession* is but one step—to it must be conjoined the "*right of possession*" and the right of property; and these latter requisites when vested in one and the same person, also vest in him the residuary proceeds of a judicial sale of land, no matter in whom the bare possession may be, no matter whether that possession be *primâ facie* lawful. But an action of ejectment effects, tries and determines possessory rights only; and the possession recovered by its agencies is a bare possession and nothing more, and may be, and often is, a possession in contravention of the right of property. One verdict and judgment does not even settle the bare possession, as between the litigants themselves permanently, for such possession may be successfully assailed in at least one subsequent action. But to exclude Mrs. P. from claiming this fund, because one verdict and judgment had been entered against her in ejectment, would give to such verdict and judgment the effect, so far as the fund was concerned, and here the fund is substituted for the land, of a complete bar to her right in it, while as to her rights in the land it would not operate as an estoppel. Surely this cannot be! Again, admitting for the moment that the right of property, and the consequent right of possession to be actually in Mrs. P., she can no longer resort to the land in the tenure of the sheriff's vendee for the vindication of those rights, for he holds by virtue of a prior title unassailable by her; but if the counsel for Mr. W. be correct, she is estopped from even *claiming* the fund; and

thus, although it is one of the proudest boasts of an enlightened jurisprudence "*that there is no right without a remedy*," she would under the assumption be vested with the right of property, without power or the mode in the law by which she could enforce it; and this, too, when as between herself and Mr. W. she has been guilty of no estopping laches ; for her second act of ejectment, if the possession were still in him, might be brought tomorrow, and would be in time.

" But the auditor is of opinion that if Mr. W.'s possession was based upon and fortified by two verdicts and judgments in ejectment against Mrs. P., she could still claim this fund, and if she established the right of property in herself could maintain her claim. At common law, there was no limit to the number of actions of ejectment which might be brought between the same parties for the possession of the same realty. At common law, practically as well as theoretically, it was simply the bare possession that was at issue. To vest an indefeasible title in any individual a "*writ of right*" was the only remedy. Our statute provides, that two verdicts and judgments therein between the same parties and their privies, shall be conclusive upon the rights of possession claimed by the other : and as ejectment is the only remedy in Pennsylvania to recover possession, two verdicts are incidentally an estoppel, not to absolute *rights*, but further remedies enforcing *possessory* rights. They vest no title in the party in whose favour they are rendered, who may in turn be dispossessed in other actions of ejectment brought by other parties. They decide nothing as to the *right* of property, which is the issue here—and which, if possessed and established here, by Mrs. P., would entitle her to this fund, *non obstantibus veredictis*.

" This disposition of the objections of counsel as to the legal status of the claimants, leaves pending the main question in the case, which is : was the purchase of these premises by Mr. P. for his wife, on the 19th day of September 1857, fraudulent in fact or at law ? As the auditor has already stated, he finds as a fact that these premises were purchased by Mr. P. with his own money, and that not a cent of Mrs. P.'s separate estate, if she had any, was paid on account of the purchase-money. It was a voluntary settlement.

" The first inquiry then is : was Benjamin Rush Plumly indebted át the time of the settlement ?

" 1. The evidence offered to establish indebtedness at the time, is very slight and unsatisfactory. It consists of the deposition of Mr. Middleton, and the letter of Mrs. A. Corlies to Harvey Shaw. The indebtedness shown by Mr. M. to exist, is one irrecoverable at law—the claim is one that has not existed since 1858, and which was surrendered by his own act, when he failed to tender the stock to Mr. P. within the time specified—for the debt, if any,

[*Woolston's Appeal.*]

arose upon Mr. P.'s agreement to take the stock off M.'s hands within a year, if the latter became dissatisfied. No tender ever was made, and the subsequent sale of the stock by M. without a tender, within the time limited, released Plumly from all liability. * * * These are the only facts establishing indebtedness on the part of Mr. P., in September 1857, or at any time previous to that date, which still remain unsatisfied. While the auditor is of opinion that this indebtedness is not sufficiently established as a legal indebtedness, which alone would be sufficient to avoid the conveyance to Mrs. P. as fraudulent—still he is inclined to give it sufficient weight to throw the burden of establishing the solvency of her husband at that time on Mrs. P. For, the auditor holds, that if an indebtedness to any amount be established at the time of a voluntary settlement, it imposes upon those claiming under it the duty of establishing solvency of a sufficiency to rebut the presumption that such voluntary settlement was covinous: 12 S. & R. 454; Black *v.* Nease, 1 Wright 438; Coates *v.* Gerlach, 8 Wright 45.

" 2. Was Mr. P. solvent in September 1857 ? The auditor, after a careful review of the whole testimony, is of opinion, and so finds, that at the time of the conveyance to Mrs. P., to wit: in September 1857, Mr. P. was solvent, and owned property which at the then market price, and for nearly three years thereafter, was worth at least $30,000. In finding this fact the auditor has rejected from consideration the declaration of Mr. P. in regard to his financial status.

" The solvency appears first in the testimony of Harvey Shaw, who says, that during the years 1856, 1857, 1858 and 1859, his credit was good, and that in the judgment of the witness he was solvent. The same opinion of his resources was entertained by Mr. Lloyd.     *     *     *     So completely had this general idea of his pecuniary ability been established, that Dr. Winder, in the spring of 1857, his neighbour, unhesitatingly received his plain note for nearly $3000 in payment of the purchase-money of land, without any security, which was promptly met at maturity by Mr. P. Dr. Winder, at the time he took the note, knew of no indebtedness on the part of Plumly to any one.

" It appears from the testimony of General Ely that from 1856 to 1860, Mr. Plumly met his indebtedness in all cases which came to his knowledge. * * In fact, wherever any of the witnesses during that period speak of an indebtedness owed by Mr. Plumly, they also speak of the payment of that indebtedness ; and there is no evidence of his failure to meet an obligation contracted during that period. This of itself establishes his solvency in September 1857. But he was much more than solvent before, at that date, and subsequently to it. General Ely testifies that he believes he was worth in 1856 from $60,000 to $75,000 ; and he enters into

details, stating what property he possessed. * * He was, therefore, beyond all question solvent in September 1857, when the voluntary settlement was made, and for at least two years thereafter—for Mr. Ely testifies that the first knowledge he had of his difficulties was in the latter part of 1860 or 1861; and that he met no losses within the knowledge of Ely until this last-mentioned period, about which time his financial difficulties came to the knowledge of Mr. Ely. It is therefore immaterial, for the purposes of this case, whether he was indebted to Mr. Middleton and Mrs. Corlies or not—for the whole amount of his liabilities to them was but $4800, and his assets must have at least amounted to $40,000. The indebtedness which would render a voluntary settlement fraudulent must be to such an amount as would approximate to embarrassment. For if any degree of indebtedness, however small, would defeat a voluntary conveyance, all would be virtually, *per se*, fraudulent, since no individual, perhaps, is at any time absolutely free from debt: Salmon *v.* Bennet, 1 Am. L. C. 31. But the liability here, as compared with the amount of Mr. P.'s resources, and the value of the voluntary settlement, which amounted in fact to but $3000, is such that it cannot in any way render the conveyance to his wife a fraud upon existing creditors. ·

" Another and grave inquiry still remains, which is, was this voluntary settlement made by Plumly with a view to protect himself against future liabilities and future risks, which he then contemplated incurring ? If it were, it would be upon the same footing, governed by the same principles and affected by the same rule of law which avoids conveyances intended to delay, hinder or defeat existing creditors. It is strongly contended that this conveyance was made with this view ; and it is insisted that at the time it was made Mr. P. was upon the eve of entering into extensive speculations, which increased his liability to loss, and endangered his whole fortune. If this be true, it would render the settlement void ; but the auditor is unable to discover any evidence of this fact.

" In 1853 Mr. Plumly retired from mercantile business and began to speculate in coal lands. At the time of this conveyance, and by means of these speculations, he had amassed more than a competency. From 1853 to 1857 he was engaged in precisely the same pursuits which employed his capital after that date ; and there is no evidence to show that the risks subsequently taken were greater than those previously incurred. With what *animus* then was this conveyance made ? For there is nothing in the resources, the liabilities, the business, or the subsequent engagements of Mr. Plumly, which, *per se*, would render the settlement void. Yet, it is nevertheless true, that if it were made with a fraudulent intent against any creditor then existing, or who might

[Woolston's Appeal.]

in future exist, it would be fraudulent and void. It could have been made with no such intent as to existing creditors, for at that time no creditors with legal rights were in existence. It could have been made with no intent to defraud Mr. Woolston, for the cause of action on which his judgment is based did not accrue until October 1860; and the only evidence which can be tortured to establish a fraudulent intent in the conveyance, against future creditors, is that afforded by the testimony of Amos Phillips, who says, that after a negotiation for the sale of these premises between Plumly and himself had fallen through, in the year 1862, on account of Woolston's attempt then pending to avoid this conveyance, Plumly urged him to take the title, because, he said, 'thee must know that I am smart enough not to let such a scamp as Woolston get ahead of me ;' and it is contended, that these words evince a fraudulent spirit as against all future creditors.

"But this declaration is peculiarly applicable by its terms to Woolston alone ; it is a triumph over him ; and yet he could not have been a party whom Mr. Plumly intended to defraud by this conveyance to his wife, because his debt was not incurred until three years after that conveyance. The declaration of Plumly is more the self-gratulation of a man rejoicing in the astuteness, which has made a provision that cannot be assailed, and an assertion of confidence in that provision, than an unblushing proclamation of his own rascality. All the circumstances rebut the idea of a fraudulent intent. The amount of the settlement at the time it was made, in comparison with the bulk of Mr. Plumly's estate, is so wholly inadequate as a protection against future creditors, that it is impossible to conceive that it was intended to delay, hinder, defraud or defeat them. It is really a settlement of but $3000 ; for the money paid for the property bought of Mrs. Plumly by Winder passed into her husband's hands as appears by the testimony of Isaac Paxson. Mr. Plumly's prosperity was so complete at the time it was made ; all his investments were then apparently so remunerative, that a provision for insolvency was almost the last step he would have taken ; and if taken, would certainly have been to an amount ample enough to maintain him in the event of its occurrence. Fraud must be proved, and cannot be presumed, and the auditor therefore finds as a fact, that this conveyance was not made with a view to future indebtedness or for the purpose of defrauding creditors, but was a gift to the wife, when the circumstances of the husband amply justified him in making it ; and when the law would recognise it as a legal and *bonâ fide* transaction. The residue of the fund, therefore, after deducting costs, is distributed to Mrs. Plumley."

The court below (Chapman, P. J.) confirmed the report and decreed distribution in conformity with it ; this was assigned for error.

[Woolston's Appeal.]

*J. L. Dubois*, for appellant.—By virtue of the Act of 1807, Mrs. Plumly would have been entitled to another ejectment, but the sheriff's sale under the prior mortgage destroyed this right and she is concluded by the ejectment. Her remedy by ejectment would be *de terris* only, and therefore she had no claim on the fund because she has lost her remedy. The evidence shows that Plumly, at the time of the conveyance, was entering upon a hazardous business, and therefore the land was to be treated as his property : Black *v.* Nease, 1 Wright 433 ; Coates *v.* Gerlach, 8 Id. 43. The conveyance was in 1857 ; in 1861 Woolston's execution found no property of Plumly. A voluntary conveyance to withdraw property from the reach of debts which the donor intends to contract, is invalid as against creditors : Snyder *v.* Christ, 3 Wright 499 ; Thompson *v.* Dougherty, 12 S. & R. 448.

*George Lear*, for appellee.—1. The appellant's argument is, that a person who cannot sustain an action of ejectment for a fund in court, which is the proceeds of a sheriff's sale of real estate, could · not have been the owner of real estate at the time of the sheriff's sale. That she cannot recover possession of the land, does not prove that she was not the owner of the equity of redemption. The verdict in an ejectment does not prove ownership, for a defendant may obtain a verdict by proving that the title is in a third person. In ejectment possession, not property, is in issue. At common law, two verdicts and long acquiescence are not a bar to ejectment : White *v.* Kyle, 1 S. & R. 515 ; 2 Id. 87. The declaration in ejectment negatived the ownership of the freehold : Stevens *v.* Hughes, 7 Casey 384. It is not the recovery, but the matter alleged upon which the recovery proceeds, that creates the estoppel : Outram *v.* Morewood, 3 East 346. If there was no fraud in Mrs. Plumly's title, she was the owner of the equity of redemption and entitled to its proceeds.

2. If a man be not indebted at the time of conveyance, or not so much so but that his property beyond the conveyance will secure his creditors, the conveyance is valid : Chambers *v.* Spencer, 5 Watts 410 ; Mateer *v.* Hissim, 3 P. R. 160 ; Posten *v.* Posten, 4 Wh. 27 ; Miller *v.* Pearce, 6 W. & S. 100 ; Sexton *v.* Wheaton, 8 Wheat. 229 ; Black *v.* Nease, 1 Wright 433 ; Coates *et al. v.* Gerlach, 8 Id. 43 ; Thompson *v.* Dougherty, 12 S. & R. 448 ; Snyder *v.* Christ, 3 Wright 499.

The auditor finds that Mr. Plumly's property was so far beyond his indebtedness, as that there was no fraud in the conveyance : 2 Kent's Com. 442 note, last ed. ; Blair McClenachan's Case, 2 Yeates 503.

The auditor has found that there were no debts existing sufficient to make the conveyance fraudulent, nor that Plumly was about entering into hazardous business. The auditor's finding

[Woolston's Appeal.]

is as binding as a verdict: Loomis's Appeal, 10 Harris 319; Mengas' Appeal, 7 Id. 222; Bull's Appeal, 12 Id. 286; Miller's Appeal and Wilhelm's Appeal, 6 Casey 478; Mellon's Appeal, 8 Id. 121; Landis *et al. v.* Scott, Id. 495; White's Appeal, 12 Id. 134.

The opinion was delivered February 8th 1866,

PER CURIAM.—The law governing the case was accurately applied by the auditor to the facts found by him, and we could not profitably add anything to what he has so well said in his report.　Nor do we think there is any good ground of complaint of the finding of the auditor, against the allegation that Plumly was on the eve of entering into a hazardous business when he made the settlement.　We think the testimony furnished no other proper conclusion than was drawn from it by the auditor, and that therefore the court committed no error in confirming the report, either upon this or the other grounds complained of.

Decree affirmed at the costs of the appellant.